IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Scott D. Gerber,

Case No. 3:14 CV 2763

                    Plaintiff,

MEMORANDUM OPINION
AND ORDER GRANTING
IN PART AND DENYING IN PART
MOTIONS TO DISMISS

          -vs-

Ohio Northern University, et. al,

JUDGE JACK ZOUHARY

                    Defendants.

### INTRODUCTION

Plaintiff Scott Gerber, a tenured professor of law at the Ohio Northern University Claude W. Pettit College of Law ("Law School"), sues ONU, two ONU officials (Provost and former Law School Dean David Crago and Director of Human Resources Tonya Paul), and two Law School faculty members (Dean Richard Bales and Professor Stephen Veltri).

Gerber details his claims in a Verified Amended Complaint, which (with attachments) exceeds 200 pages and collects more than seven years' worth of workplace grievances (*see* Doc. 8). Gerber claims he has been bullied, lied to, retaliated against, and wrongly denied more than one hundred thousand dollars in retirement benefits. Defendants now move to dismiss the Complaint (Docs. 13–17); Gerber opposes (Doc. 20).

### BACKGROUND

**Gerber Joins the ONU Law School Faculty**

Gerber joined the Law School in 2001 as a visiting assistant professor, receiving tenure as a full professor in 2007 (Doc. 8 at ¶ 10). He is a constitutional law scholar, a nationally renown legal historian, and a four-time winner of the Law School's Fowler V. Harper Award. He held the Ella &

Ernest Fisher Chair in Law in consecutive years (*id*. at ¶ 11), earning "the highest recognition the college of law has to offer a member of its faculty" (Doc. 8-1 at 21; *see also* Doc. 8-3 at 9).

Relations between Gerber and ONU soured soon after Gerber won tenure. In the fall of 2007, then-Associate Dean John Christoff "unilateral[ly]" changed one of Gerber's grading decisions (Doc. 8 at ¶ 42). Gerber grieved Christoff's action (*id*. at ¶ 13), but received no satisfaction from ONU. Gerber also complains that "in 2008 and 2009" then-Dean Crago "stall[ed] on letters of reference that Mr. Crago agreed to submit on Mr. Gerber's behalf" for positions at other universities (*id*. at ¶ 42).

**ONU Improperly Administers Gerber's Retirement Benefits**

In May 2007, ONU faculty learned their pension benefits had been administered improperly. ONU offers qualifying faculty and staff a defined contribution retirement plan through Teachers Insurance and Annuity Association - College Retirement Equities Fund ("TIAA-CREF") (Doc. 8-2 at 1). ONU is Plan Administrator (Doc. 8 at ¶ 59; Doc. 8-2 at 17). The University has discretionary authority to "determine all questions concerning . . . contributions under the Plan" and to construe Plan terms (Doc. 8-2 at 17).

In 2007 the Plan "required [plan participants] to match the first 7.5% of the University contribution [of 10% of the plan participant's "regular salary"] through salary reduction" (*id*. at 1). A plan participant's "salary . . . is reduced and the amount of the reduction is applied as premiums to" a Plan investment (*id*. at 23). These matching contributions "are required to be made as a condition of employment on a tax-deferred basis" (*id*. at 9). A plan participant may contribute to a Plan investment no more than "the limits imposed by [Internal Revenue Code] section 412 and section 402(g)" (*id*. at 23; *see also id.* at 9–10).

2

Gerber "entered into a written agreement with ONU [under which he instructed ONU] . . . to make voluntary tax-deferred contributions up to the 402(g) limit" (Doc. 8-3 at 14).  "ONU's 403(b) plan states no deferral limit other than [the] 402(g)" limit (*id*. at 40).  Section 402(g) caps the favorable tax treatment given "elective deferrals," but excludes from capped "elective deferrals" "a contribution made as a condition of employment that reduces the employee's compensation." 26 C.F.R. § 1.402(g)(3)-1.

Stated in concrete figures: if the Section 402(g) cap is $15,000, and if a professor contributes 7.5% of his $100,000 salary as a condition of employment, the professor's mandatory $7,500 contribution is not included in the Section 402(g) cap.  The professor receives favorable tax treatment for $15,000 in contributions, above and beyond the amount of the mandatory contribution, but can annually contribute $22,500 to Plan investments.  Therefore, Gerber's written agreement directed ONU to contribute in each tax year an amount equal to the Section 402(g) cap, calculated by not including the mandatory 7.5% matching contribution.

But for each pay period from 2002 through mid-2007, ONU calculated Gerber's 402(g)-limit contribution by including his mandatory 7.5% matching contribution (*see* Doc. 8-3 at 31).  In April 2008 then-ONU President Kendall Baker testified about the pension contribution issue at a University Council hearing.  Baker explained that ONU learned of the contribution issue in Spring 2007; initially blamed TIAA-CREF for the error; eventually admitted responsibility for the mistake; and engaged Buck Consultants, an actuarial firm, to estimate "reasonable" settlement amounts that ONU offered affected employees, totaling more than $248,000 (*id*. at 34–36).

In early 2008, following discussion between ONU's attorney and the affected employees' pension attorney, Buck Consultants calculated a second settlement figure, totaling $659,000, equal

3

to one-half of the affected employee's missed deferrals.  ONU refused the sum because it was "too much to pay" (*id*. at 14–15, 32).  In turn, Gerber and others rejected ONU's ten-cents-on-the-dollar settlement offer (and the release of claims that accompanied the offer) because they disagreed with the assumptions Buck Consultants used to arrive at the figure; the disputed assumptions were in part the product of ONU's legal conclusions about the scope of its authority as Plan administrator (*see id*.; *see also id.* at 15).

Baker wrote the University Council after the 2008 hearing, explaining "the only way to definitively resolve the differences between the University and the concerned parties is to invite the [IRS] to review our records and procedures" (*id*. at 37).  In May 2008, affected employees formally invited the IRS review (*id*. at 13–22).

That same month, ONU denied Gerber's request that it make Gerber whole by replenishing his retirement account, reasoning Gerber already had been "afforded the opportunity to make the maximum allowable contribution to the Plan" (*id*. at 41).  ONU further explained that, between 2002 and 2006, the IRS offered little guidance on what it considered a "condition of employment" for calculating the elective deferral limit.  ONU told Gerber that, because of this uncertainty, ONU used its discretionary authority to err on the side of conservatively setting employees' maximum contribution "to prevent any adverse tax consequences to the Plan's participants" (*id*. at 41–43).  ONU informed Gerber that its May 2008 denial paved the way for judicial review of the decision under Section 502(a) of the Employee Retirement Income Security Act ("ERISA") (*id*. at 43).

In September 2010, the IRS completed its review.  While the examining IRS office did not propose a change in the Plan's Section 403(b) status, it provided ONU four "advisory comments" "which require[d ONU's] attention" (*id*. at 11–12).  Relevant here, the IRS wrote (*id*. at 12):

4

The examination also revealed that certain employees who requested maximum allowable elective deferrals under 402(g) of the Code may have missed a tax deferral opportunity during the 2002 through 2006 tax years.  Specifically, the University reduced maximum allowable deferrals by the amount of mandatory employee contributions required under Plan terms.  The determination has been made that reducing allowable elective deferrals by the amount of mandatory contributions did not result in any violation of IRC section 403(b) for the 2002 through 2006 tax years.  Prior to the examinations [sic] conclusion, the University[,] on a purely voluntary basis, restored lost benefits determined by Buck Consultants for the missed deferral opportunity, plus interest in accordance with reasonable estimates provided under [relevant Revenue Procedures] and improved practices and procedure to preclude future missed opportunities to elect the maximum allowable elective deferral under IRC section 402(g).  The determination has been made that the University's voluntary payments for the missed tax deferral are eligible for the [Revenue Procedure's Self Correction Program] and did not adversely affect the Plan's IRC Section 403(b) status.  Please be advised that on or after January 1, 2009, failure to follow the requested maximum deferral elections and Plan terms[] could result in a determination that your Plan no longer satisfies IRC section 403(b).

Gerber and others alleged an additional contribution-computation error in August 2011, and unsuccessfully sought satisfaction from ONU.  ONU stated it had complied with the Plan (*see id*. at 25–27).

### ONU awards Christoff the Fisher Chair, a Colleague Criticizes Gerber's Political Leanings, and ONU Denies Gerber's Grievances

Meanwhile, Gerber encountered conflict at the Law School.  Gerber began the 2009–10 academic year as the Fisher Chair, having been reappointed to a second term the prior spring semester.

Under Law School policy, "[t]he Fisher Chair shall be awarded to a member of the faculty of the College of Law with a record of sustained excellence in scholarship, teaching and service to the legal community" (Doc. 8-1 at 21).  "By a 2/3 vote [of] those present and voting, the Tenure Committee [] recommend[s] a nominee to the Dean for [initial] appointment [to] the Fisher Chair," and may reappoint the incumbent Fisher Chair by a majority vote (*id*.).  Gerber nominated himself

5

to serve as the Fisher Chair for a third consecutive academic year.  ONU instead appointed Christoff to the Chair, "a retiring . . . law faculty member who had not published in approximately twenty years" and who had improperly overruled Gerber's grading decision in 2007 (Doc. 8 at ¶ 12).

Gerber grieved Christoff's appointment.  A standing three-member Grievance Committee considered his claim; the Law School Dean appoints one member, while the faculty elects the other members (Doc. 8-1 at 24).  "[M]embers of the [Law School's] grievance committee had a conflict of interest in the matter because they had participated directly in the decision that Mr. Gerber was grieving" (Doc. 8 at ¶ 13).  Two of the three Grievance Committee members had voted in their capacity as Tenure Committee members to recommend Christoff for the Fisher Chair.  Gerber asked the two Grievance Committee members to recuse (*id.*), citing the Law School's Internal Grievance Procedure.  At the time, the Procedure provided that "[i]n the event that a standing member (or members) of the Grievance Committee has participated directly in a decision complained of, that member (or those members) shall be replaced by another faculty member (or members) selected by mutual agreement of the remaining members of the Grievance Committee" (Doc. 8-1 at 24–25).

Six days after the grievance hearing, the Grievance Committee rejected Gerber's recusal request and his grievance (*see* Doc. 8 at ¶ 13).  The Grievance Committee denied the recusal request because, though the two Committee members had voted on the Fisher Chair nomination, neither Committee member "participated in the Dean's decision that is the subject of the present grievance" (Doc. 13-1 at 29).  The "decision" being grieved, explained the Grievance Committee, was the Dean's decision to refer the Tenure Committee's Fisher Chair nominee to the ONU Board of Trustees, not the Tenure Committee's earlier vote (*id.* at 24–24).  And the Grievance Committee denied the grievance because "the sole authority to recommend an appointee to the Fisher Chair [wa]s vested in

6

the Tenure Committee" (*id*. at 31).  The Law School Dean had no authority to submit a different Fisher Chair nominee to the Board (*id*. at 31, 32–34).

In May 2010, the American Association of University Professors ("AAUP") urged President Baker to rehear Gerber's grievance, if in fact "the Tenure Committee's recommendation . . . served as the basis for the dean's decision" to recommend Christoff to the Board (Doc. 8-3 at 1–2).  ONU refused.  Instead, Crago reappointed one of the conflicted Grievance Committee members for a new term (Doc. 8 at ¶ 15).

In August 2011, the Law School faculty voted to amend the Internal Grievance Procedure to: (1) bar grievance of "[t]he appointment to the Fisher Chair, the Fowler Harper Scholarship Award, Faculty Teaching Award," and any other decision identified by faculty rule; and (2) eliminate the recusal request provision Gerber had invoked (*id*. at ¶ 15; Doc. 8-1 at 29).  In Spring 2012, Veltri told Gerber he would "never again be awarded the Fisher Chair because the law faculty 'doesn't like' him" (Doc. 8 at ¶ 45).  Gerber has not been reappointed to the Fisher Chair.

Gerber also complained in early 2012 that, while advising students on course selection for the following semester, another law professor urged students to avoid Gerber's classes because "Mr. Gerber is 'too conservative' and a 'tyrannical Republican.'"  Gerber claims these comments violate his academic freedom (*id*. at ¶ 22).  Then-Associate Dean Veltri did not "discourag[e] or reprimand[]" the colleague (*id*. at ¶ 45).

### Veltri grabs Gerber and Gerber Reports the Altercation

Veltri figures chief among Gerber's "bullies" in the Complaint.  Veltri "had previously sworn at and blown up at Mr. Gerber" during a 2007 faculty meeting chaired by Crago, who asked Veltri to issue Gerber a written apology (*id*. at ¶ 17).  In 2011, Veltri "hit Mr. Gerber with his door to the office while he was yelling at Mr. Gerber that he is 'not accountable to' Mr. Gerber."  Gerber

7

complained to Crago about this second incident (*id.*). Veltri had "yelled at other people" at ONU, too (*id.* at ¶ 18).

Then, in October 2012, Veltri "verbally berated and attacked Mr. Gerber as he grabbed and squeezed Mr. Gerber's shoulder in a tight and strong fashion with the belief that an injury was substantially certain to occur, which it did" (*id.* at ¶ 17). One year later Gerber sought medical treatment for shoulder pain that he believed Veltri caused (Doc. 8-2 at 49–51). Dr. Michael Muha concluded in his written assessment that Gerber's right shoulder pain, possibly a rotator cuff tear, was "[p]robably mostly degenerative in nature" (*id.* at 50). Dr. Muha did not opine in writing on Veltri's role in causing the shoulder pain. But Gerber affirms under penalty of perjury (*see* Doc. 8 at 34) that Dr. Muha "indicated that, at a minimum, the painful symptoms Mr. Gerber has experienced with his torn rotator cuff since the incident were caused by Mr. Veltri's conduct on October 8, 2012" (*id.* at ¶ 38; *see also* Doc. 20 at 5–6).

Gerber promptly reported the alleged assault to ONU security officer Ellie Laubis, "who concluded that Mr. Veltri had committed on assault on Mr. Gerber" (Doc. 8 at ¶ 25). At Officer Laubis' direction, Gerber also reported the incident to the Campus Security Hotline (Doc. 8-3 at 44). He traded e-mails with Director of Human Resources Tonya Paul, who asked to interview Gerber. When pressed by Gerber to identify a University policy that called for Human Resources involvement, Paul responded that the "intent" of ONU campus security policies was that campus security and the Campus Security Hotline should be contacted "only . . . when criminal activity involving a student(s) arises on campus." She explained that ONU's past practice of responding to staff-on-staff violence included investigation by Human Resources (*id.* at 44–45). Gerber says Paul lied to him about "whether Ohio Northern University Security has jurisdiction over workplace violence" (Doc. 8 at

8

¶ 22).  The relevant policies clearly state that campus security should be contacted in all cases of on-campus criminal activity (*see* Doc. 8-1 at 43–44, 46–47).

Gerber later reported the incident to the Occupational Safety and Health Administration (the first of five such complaints on different topics, Doc. 8 at ¶ 68), the Kenton City Prosecutor, the Ada Police Department, the American Bar Association, and the National Association of Scholars ("NAS") (*id*. at ¶ 78).  Paul initially denied that OSHA had "jurisdiction" over ONU.  OSHA found the response unacceptable, and ONU admitted that OSHA did in fact have jurisdiction over the Veltri incident (*id*. at ¶ 68).

Back at the Law School, Veltri began "glaring" at Gerber (*id*. at ¶ 45).  Crago appointed Veltri interim Law School Dean over Gerber's objection (*id*. at ¶ 18).

**ONU Retaliates Against Gerber and Bullying Continues**

In November 2012, Crago told Gerber to report "in-house" both the Veltri incident and any retaliation he suffered for reporting the incident.  Gerber insisted he had a right to report violence or retaliation to federal, state, or local law enforcement and regulators (*id*. at ¶¶ 69, 71).  OSHA closed its investigation of the Veltri incident in December 2012, and Crago "reprimand[ed] Mr. Gerber in writing" that same month (*id*. at ¶ 42).

In March 2013, Gerber complained at length to OSHA that ONU had not properly compensated him for his many publications (*id*. at ¶ 22; Doc. 8-3 at 49–51).  Law School policy recognized "each faculty member for scholarly activity" by providing cash awards (Doc. 8-2 at 37–41).

In April 2013, non-party Professor Mike Lewis "bullied" Gerber; Crago refused to meet with Gerber about the episode (Doc. 8 at ¶ 42).  Bales, who succeeded Veltri as Dean, recorded his first

meeting with Gerber (*id.* at ¶ 44).  In August 2013, Bales issued a faculty memorandum, instructing faculty that "[a]nyone who witnesses or is victimized by behavior that is intimidating, harassing, unprofessional, or bullying should report such conduct to me" and Human Resources officials (Doc. 8-3 at 10); Gerber interprets this memo as an attempt to "prohibit[ him] . . . from reporting subsequent incidents of workplace violence outside" of ONU (Doc. 8 at ¶ 42).

Bales met again with Gerber in September 2013, and again recorded the meeting.  Bales (1) "order[ed] Mr. Gerber to teach an extra course" on a topic he had not studied in law school and which fell outside of his scholarly focus, and (2) barred Gerber from serving on a faculty committee aside from the Tenure Committee, an assignment he held by right (*id.* at ¶ 44; *see also* Doc. 8-3 at 46–47). That same month, the NAS wrote then-President Daniel DiBiasio, noting Gerber's complaints and ONU's apparent passivity to those complaints. NAS urged ONU to "refer these disputes to a disinterested third party" (Doc. 8-1 at 19–20).  ONU ignored NAS (Doc. 8 at ¶ 44).  At some point in 2013, Gerber also complained about bullying and other issues to the ABA's 2013–14 re-accreditation site team during its visit to the Law School.  ONU ignored the site team's advice that it "address the issues" (*id.* at ¶¶ 42, 44).

In October 2013, Gerber filed suit in the Hardin County Court of Common Pleas, raising claims substantially similar to the claims in this case (Gerber later voluntarily dismissed the 2013 suit without prejudice) (*id.* at ¶ 9).  Bales circulated a copy of the 2013 complaint to faculty, "trying to intimidate Mr. Gerber about it and the related concerns that Mr. Gerber had raised with the ABA during a faculty and staff meeting the same day by discussing it an [sic] angry way" (*id.* at ¶ 44).

Finally, ONU refused to allow Gerber to compete for the 2014 or 2015 Fowler Harper Awards (*id.* at ¶ 22).

10

Gerber alleges all of these episodes caused him physical injury (*e.g.*, shoulder pain) and mental distress. Since 2010, Gerber provided ONU with at least three notes from medical professionals, explaining a history of vertigo, migraines, high blood pressure, and other mental health issues, all of which are allegedly aggravated by stress (*see id*. at ¶ 41; Doc. 8-2 at 43–48, 59–65).

### STANDARD OF REVIEW

Federal Civil Rule 8(a)(2) requires, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." This Court tests a complaint's legal sufficiency by accepting as true all well-pled factual allegations and construing the complaint in the light most favorable to the plaintiff. *See Duabay v. Wells*, 506 F.3d 422, 426 (6th Cir. 2007). Although the complaint need not contain "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

### DISCUSSION

The Complaint's eight counts fall into two categories. First, Gerber seeks to impose direct liability for a Defendant's own conduct. Those direct-liability claims include:

- Breach of Contract (Count I) as to ONU;

- Assault and Battery (Counts II and III) as to Veltri;

11

- Intentional Infliction of Emotional Distress (Count IV) as to Bales, Crago, Paul and Veltri;

- Negligent Retention and Supervision (Count V) as to ONU;

- an ERISA claim (Count VI) as to ONU;

- Retaliation under Ohio Revised Code § 4113.52 (Count VII) as to ONU; and

- Common law retaliation (Count VIII) as to ONU.

Second, in two derivative-liability claims, Gerber alleges ONU is liable for the actions of its employees on the basis of respondeat superior:

- Assault and Battery (Counts II and III) because of Veltri's conduct; and

- Intentional Infliction of Emotional Distress (Count IV) because of the individual Defendant's conduct.

**Direct Liability Claims**

***Breach of Contract***.  Gerber divides his breach of contract claim into eight sub-claims.  But he spends less than a page of his Opposition brief explaining why he plausibly alleges a breach with respect to any of these sub-claims (*see* Doc. 20 at 2–3).  Gerber says he "refers to the specific sections of the applicable handbooks that were breached in subsections (i) - (viii)," (*id*. at 3), but that is not true.  He instead refers to whole policies, some of which are lengthy and complex.

For example, Gerber refers to "Internal Grievance Procedure in College of Law's Faculty Policy Manual and sections 2.2 & 2.24 of Ohio Northern Faculty Policy Manual" in support of sub-claim III, premised on ONU's failure to discipline a faculty member who criticized his political leanings (Doc. 8 at ¶ 22).  But he points to two different versions of the Internal Grievance Procedure (*compare* Doc. 8-1 at 28–32 *with id.* at 22–25), and provides no explanation of how ONU "permitted" the faculty member to infringe on Gerber's academic freedom, or how her actions or ONU's response

12

violated particular provisions of any of the documents to which he generally refers.  The documents span ten pages, and contain detailed grievance procedures.

As a matter of substantive law, Gerber's presentation of his claims is insufficient.  Gerber must "specify what contractual terms were breached" when it is not otherwise apparent which terms he claims ONU breached.  *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App. 3d 770, 778 (2003).  And as a matter of procedural law, a party waives an argument raised, as here, without any attempt at development.  *Cf. United States v. Johnson,* 440 F.3d 832, 846 (6th Cir. 2006).  Law students are taught that an assertion is not an argument.  Here, as elsewhere, Gerber offers only assertions (*see, e.g.*, Doc. 20 at 17) (asserting, without caselaw support or analysis, adverse employment actions).  The fact that this Court must accept well-pled allegations as true at this stage is not a "dispositive fact" (*id*. at 2) when Gerber does not explain the legal basis for his many breach sub-claims.

In the alternative, this Court rejects Gerber's apparent breach of contract claims.  Gerber must allege "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff."  *Jarupan v. Hanna*, 173 Ohio App. 3d 284, 294 (2007) (internal quotation marks omitted).  "A party breaches a contract if [the party] fails to perform according to the terms of the contract or acts in a manner that is contrary to its provisions."  *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (applying Ohio law).

Sub-claim I alleges ONU breached a contract when it appointed Christoff to the Fisher Chair.  Gerber's apparent argument is that Christoff was not qualified for the appointment (either by the quality of his work or because of the grade-change incident), and because the Tenure Committee appointed him anyway, ONU breached its promise to only appoint qualified Fisher Chair professors.  But under the Fisher Chair policy, the Tenure Committee wields broad discretion in selecting the

13

Fisher Chair.  The Committee could reasonably make the award to a longstanding faculty member despite his lack of publications; a law professor can be an outstanding educator without publishing law review articles.  Gerber cannot second-guess the Committee's decision five years later in federal court through a breach of contract claim.

Sub-claim II premises a breach of contract claim on a laundry list of ways ONU corrupted the hearing process for Gerber's grievances.  Gerber's bald assertions that Crago "lied" or that the Grievance Committee submitted a report that contained "false statements" contain no facts explaining what the alleged misstatements were and why they were false; the conclusory "liar" allegations therefore are not entitled to a presumption of truth.  Gerber does not explain how and when Crago failed to used mediation processes.  And this Court cannot divine from the pleadings or attachments when the Grievance Committee "dismiss[ed] without a hearing two subsequent grievances Mr. Gerber had filed even though neither respondent had filed a response denying Mr. Gerber's allegations" (Doc 8 at ¶ 22).

Timing is important here.  After the 2011 amendments to the Internal Grievance Procedure, the Grievance Committee could summarily dismiss a grievance for failure to state a claim (*see* Doc. 8-1 at 30) (Stage 6(A)(4)).  To the extent Gerber now asserts the Stage 6(A)(4) provision did not apply because his grievances stated plausible claims for relief, he provides no explanation for why that was the case, much less the subject matter of his subsequent grievances.  Gerber cites no caselaw or other explanation for why a plausible breach of contract claim exists with respect to the failure-to-recuse element of this sub-claim; the Grievance Committee expressly considered Gerber's recusal request and provided a reasoned (if not persuasive) basis for denying the request.

14

Under sub-claim III, Gerber says ONU breached a contract by failing to properly discipline the staff member who criticized his political leanings.  He points to no caselaw supporting his assertion that a university breaches a contract when it fails to discipline one faculty member to the liking of the grievant.  ONU provided process for Gerber to grieve his colleague's comments, and Gerber availed himself of that process.

Sub-claim IV finds a breach of contract in Paul's "lies" about the Faculty Policy Manual and the 2011 Safety and Security policy, which explain how ONU processes safety complaints and "encourage[s]" staff members to report crimes according to certain procedures (*id*. at 43).  It is unclear how ONU acted inconsistent with any of those procedures, much less that any of the procedures constitute contractual obligations.

Sub-claim V alleges ONU "mishandl[ed] Mr. Gerber's retirement benefits and l[ied] about it" (Doc. 8 at ¶ 22).  But it is indisputable that ERISA governs Gerber's retirement plan (*see id*. at ¶ 60; Doc. 8-2 at 17, 32).  Because "in essence [his] . . . claim is for the recovery of an ERISA plan benefit," *Cromwell v. Equicor-Equitable HCA Corp*., 944 F.2d 1272, 1276 (6th Cir. 1991), ERISA preempts sub-claim V.

Gerber provides no factual allegations explaining how and when he was prevented from competing for the Fowler V. Harper Award, which is the basis for sub-claim VI.  He does not explain how a call for applications for an award creates a contract between him and ONU.

Sub-claim VII alleges ONU failed to "appropriately compensate" Gerber for his publications under the "Professional Engagement and Development Committee" document he attaches to his Complaint.  He does not explain which publications he was allegedly shorted on, when, or by how much.  Moreover, Gerber alleges the "Professional Engagement and Development Committee"

15

document represents a contract between ONU and himself.  If so, the same document makes the Dean's decisions with respect to publication compensation "final, . . . not subject to appeal, grievance, or other challenge" (Doc. 8-2 at 40).  By agreeing to that expansive language, Gerber plainly agreed that he could not challenge the substance of publication compensation decisions in this Court.

Sub-claim VIII bases a breach of contract on the allegation that ONU "fail[ed] to follow the College of Law's work environment policy in an October 8, 2014 incident reported by Mr. Gerber" (Doc. 8 at ¶ 22).  Gerber points to no portion of the Complaint or Complaint attachments (and this Court has found none) describing what happened on October 8, 2014, to whom and when he reported his grievance related to that event, how ONU failed to comply with its "policy," or how the August 2013 memorandum (*see* Doc. 8-3 at 10) on which he relies contractually binds ONU to do anything.

Gerber's breach of contract claims fail because Gerber points to no specific contractual language that ONU breached; he waived any argument in support of the claims by failing to offer even a bare-bones analysis of his breach theories; and he failed to include factual allegations or material in his 200-plus-page pleading to support a plausible breach of contract claim.

***Assault and Battery.***  "A person is subject to liability for battery when he acts intending to cause a harmful or offensive contact, and when a harmful contact results.  Contact which is offensive to a reasonable sense of personal dignity is offensive contact."  *Love v. City of Port Clinton*, 37 Ohio St. 3d 98, 99 (1988) (internal citation omitted).  Accepting as true the Complaint's allegations, a reasonable person could find Veltri's alleged conduct offensive -- tightly grabbing and squeezing the shoulder of another during a heated argument.  Gerber has alleged under penalty of perjury that Dr. Muha said his shoulder injury is in part the result of the October 8, 2012 incident.  (Dr. Muha did not opine in his written notes that the shoulder injury was not caused by the incident, just that the shoulder

16

injury was mostly degenerative in origin.)  Gerber therefore alleges causation and damages; Veltri's arguments regarding the evidentiary support for the causation allegations (*see* Doc. 17 at 4–5) are premature.  And for the same reasons, Gerber alleges a plausible assault claim.

***Intentional Infliction of Emotional Distress ("IIED").***  A person "who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 6 Ohio St. 3d 369, 374 (1983) *abrogated on other grounds by Welling v. Weinfeld*, 113 Ohio St. 3d 464 (2007) (internal quotation marks omitted).  "In a case for intentional infliction of emotional distress, a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." *Phung v. Waste Mgt., Inc.*, 71 Ohio St. 3d 408, 410 (1994).

But "[t]here is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam." *Reamsnyder v. Jaskolski*, 10 Ohio St. 3d 150, 153 (1984) (per curiam) (internal quotation marks omitted).  "Clearly, not every wrongful act is outrageous.  Only the most extreme wrongs, which do gross violence to the norms of a civilized society, will rise to the level of outrageous conduct." *Brown v. Denny*, 72 Ohio App. 3d 417, 423 (1991).  "Whether conduct is 'extreme and outrageous' is initially a question of law for the court." *Morrow v. Reminger & Reminger Co., L.P.A.*, 183 Ohio App. 3d 40, 62 (2009).

None of the many actions listed in any of Gerber's IIED claims, directed against the individual Defendants, allege a plausible IIED claim.  Gerber alleges dozens of purportedly outrageous actions. This Court will not discuss each of these meritless claims in detail.  But to take only a few examples: As a matter of law, Crago and Veltri's support for modifications to the Internal Grievance Procedure is not outrageous; it is an example of a common dispute between a university administrator (who favors procedures granting the administration greater discretion) and a faculty member (who favors procedures that check administrator discretion).

It is neither extreme nor outrageous that Crago asked Gerber to teach an additional class on a topic Gerber had not taken in law school; a request to take on extra work, dealing with unfamiliar issues, is a normal part of many jobs.

Paul's alleged role in "mishandling the process in 2011 to ensure Mr. Gerber's retirement moneys were properly processed" is not grounds for IIED liability (Doc. 8 at ¶ 43).  As Gerber's own allegations and supporting materials show, by 2011 ONU had admitted its mistake in calculating the deferral limit; all that remained at that time was a dispute over the amount owed to affected plan participants from the error.  That dispute turns on differing actuarial assumptions and legal opinions, and none of the materials show Paul had any role in the dispute.  Disputes over money owed are not utterly intolerable in a civilized society; they are common.

Bales' decision to circulate the October 2013 complaint "and [then] discuss[] it an [sic] angry way" is not outrageous (*id*. at ¶ 43); it is a regular (if not desirable) reaction of a person sued for money damages.  In November 2014, Bales wrote that he "has disdain for Mr. Gerber professionally" (*id*.).  That is precisely the kind of unflattering opinion that falls outside the scope of an IIED claim.

18

*Miller v. Currie*, 50 F.3d 373 (6th Cir. 1995), does not require a different result.  For one, that decision depended heavily on the motion to dismiss formulation of *Conley v. Gibson*, 355 U.S. 41 (1957).  *See Miller*, 50 F.3d at 378 ("Because it is conceivable that a set of facts could be proved in support of the complaint's allegations under which Miller would be entitled to relief for intentional infliction of emotional distress, the claim should not have been dismissed.").  The *Conley* standard no longer controls at the motion to dismiss stage.  "Two recent decisions[, *Twombly* and *Iqbal,*] have changed the long-standing rule of *Conley v. Gibson*" to require facially plausible complaint allegations.  *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1050 (6th Cir. 2011); *see also Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629–30 (6th Cir. 2009).  And, the *Miller* court correctly observed that "hiding a ninety-eight year old, physically infirm mother from her adult daughter, and causing the daughter to be arrested for attempting to visit her mother [at a nursing home], could under some set of facts constitute 'extreme and outrageous' conduct." *Miller*, 50 F.3d at 378.  Such allegations are a far cry from Gerber's lament that Law School leadership required him to attend a dinner event when he had a migraine.  Gerber alleges no plausible IIED claim.

***Negligent Retention and Supervision ("NRS").***  "A successful claim for negligent hiring or retention must establish the following elements: (1) the existence of an employment relationship, (2) the employee's incompetence, (3) the employer's actual or constructive knowledge of such incompetence, (4) the employer's act or omission causing plaintiff's injuries, and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." *Peterson v. Buckeye Steel Casings*, 133 Ohio App. 3d 715, 729 (1999).  "An employer may be negligent if [the employer] knew, or should have known, that [an] employee had a propensity for

19

violence and that the employment might create a situation where the violence would harm a third person." *Staten v. Ohio Exterminating Co.*, 123 Ohio App. 3d 526, 530 (1997) (internal quotation marks omitted).  "The foreseeability of a criminal act depends on the knowledge of the defendant, which must be determined by the totality of the circumstances, and it is only when the totality of the circumstances are 'somewhat overwhelming' that the defendant will be held liable." *Evans v. Ohio State Univ.*, 112 Ohio App. 3d 724, 742 (1996)

Accepted as true and viewed in the light most favorable to Gerber, the Complaint plausibly states an NRS claim.  Veltri was an ONU employee at all times relevant to this claim.  Gerber plausibly alleges that, prior to October 2012, he repeatedly complained to ONU.  "[A]n employer often gains knowledge of harassment through a victim's complaints." *Southerland v. Sycamore Cmty. Dist. Bd. of Educ.*, 277 F. Supp. 2d 807, 818 (S.D. Ohio 2003).

In 2007, Veltri shouted and cussed at Gerber during a faculty meeting chaired by then-Law School Dean Crago.  Crago ordered Veltri to apologize to Gerber in writing.  In 2011, Veltri again shouted at Gerber and struck Gerber with an office door.  Gerber told Crago of this second altercation. Veltri also is known at ONU for having a "bad temper" and yelling at others.  And in 2011 and 2012, Veltri served in administrative capacities (Associate Dean, then interim Dean) that promised to draw Veltri and Gerber into conflict over Law School governance.  *See Evans*, 112 Ohio App. 3d at 743 (explaining the foreseeability of criminal conduct by an employee "depend[s] largely" on the incompetent employee's control over and interaction with the third party who is injured).

Considering the totality of these circumstances, at this early pleading stage, Gerber's claim is sufficient to withstand dismissal.  ONU's arguments to the contrary are more appropriately addressed at summary judgment or trial.

However, because "in order to maintain an action against the employer, a third party must allege that one of the employees is individually liable for a tort," *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 517 (6th Cir. 1999) (applying Ohio law), and because Gerber does not otherwise plausibly allege tortious conduct on the part of an individual Defendant, his NRS claim fails as to Veltri's other conduct (*e.g.*, glaring at Gerber), or the conduct of other Defendants.

**ERISA.** Gerber's ERISA claim seeks "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). ONU argues two determinations in the September 2010 IRS letter defeat this claim. First, the IRS found ONU's incorrect calculation of elective deferrals did not violate the Internal Revenue Code. Second, the IRS noted ONU had restored lost benefits to affected plan participants through the settlement offers.

ONU offers no caselaw for its assertion that an IRS letter finding that conduct did not violate the Internal Revenue Code means a plaintiff has no ERISA claim; it is ONU's burden on a motion to dismiss to show that conclusion necessarily follows from the IRS's finding. Further, the IRS specifically warned ONU that further allocation errors "could result in a determination that your Plan no longer satisfies IRC section 403(b)" (Doc. 8-3 at 12), a drastic action that could result in some or all plan participants owing significant back-taxes. Read in the light most favorable to Gerber, the IRS simply exercised its discretion not to take drastic action against ONU.

And despite the IRS's unexplained statement that ONU "restored lost benefits" to affected employees, Gerber plausibly alleges that he is still owed money for ONU's admitted mistake. The IRS statement is true as to employees who accepted Buck Consultant's ten-cents-on-the-dollar settlement offer. But Gerber rejected that offer. And though ONU apparently contributed funds to

21

Gerber's pension account as partial satisfaction for the mistake, he plausibly alleges that he has not been made whole (Doc. 8-3 at 38) ("The dollar amount ONU placed in my pension account is $65,556.17 less than the last calculation I received from an accountant.").  Aside from the IRS letter, ONU points to no Complaint allegation or attachment contradicting Gerber's consistent claim that he "was not restored all his lost benefits (plus interest)" (Doc. 20 at 13) (emphasis omitted), and no other reason why Count VI is legally insufficient.  Gerber's ERISA claim can proceed.

*Retaliation under O.R.C. § 4113.52.*  "[T]he presentments required in a whistle blower case are no different from those in any other retaliat[ion] . . . suit.  The plaintiff must first [allege] a prima facie case by showing that (1) he or she engaged in activity which would bring him or her under the protection of the statute, (2) was subject to an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action."  *Wood v. Dorcas*, 142 Ohio App. 3d 783, 791 (2001) (internal citations omitted).

"A materially adverse employment action must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  *Campolieti v. Cleveland*, 184 Ohio App. 3d 419, 426–27 (2009) (internal quotation marks omitted); *see also Kelly v. Lambda Res., Inc.*, 89 F. App'x 535, 545 (6th Cir. 2004) (applying Ohio law and explaining that "[t]rivial episodes of unpleasantness or admonition, or other de minimis employment actions, standing alone, cannot supply legally sufficient evidence of actionable material discipline or retaliation, even if they were arguably impelled by protected activity," and noting as examples of de minimis employment actions an

employee being treated with hostility, having critical memoranda placed in his or her file, and receiving reduced performance ratings); *Rice v. Cuyahoga Cty. Dep't of Justice*, 2005-Ohio-5337, ¶ 51 (Ct. App.) (unpleasant treatment at work not sufficient to establish an adverse employment action); *Eakin v. Lakeland Glass Co*., 2005-Ohio-266, ¶ 20 (Ct. App.) (in the absence of a demotion or pay decrease admonishments insufficient to establish adverse employment action); *Toth v. Ohio Dep't of Youth Serv.*, 113 Ohio Misc. 2d 1, 11 (Ct. Cl. 2001) (same).

Even accepted as true, Gerber alleges only de minimis employment actions, some of which are time-barred (*see* Doc. 13 at 25).  Among other things, Gerber complains that ONU did not adequately publicize his many accomplishments; required him to attend a dinner though he had a migraine; refused to seat him on faculty committees other than the Tenure Committee; ordered him to teach an additional class he had not studied in law school; reassigned a class; refused to meet with Gerber; and expressed disdain for Gerber (*see* Doc. 8 at ¶ 72).  These and other allegations show significant tensions between Law School faculty.  But they do not show any material change in Gerber's benefits or job duties.

Gerber alleges that ONU barred him from the Fowler Award competition and failed to appropriately compensate him for his publications, actions he says caused him to lose  additional pay.  But neither alleged act suffices as an adverse employment action, because both refer to the foregone possibility of greater pay.  *Cf. Campolieti*, 2009-Ohio-5224 at ¶ 19 (denial of a lateral transfer request not an adverse employment action when there existed only "the possibility" of increased pay or prestige in the new positions).  ONU barred Gerber from competing for the Fowler award.  On these allegations it is speculative that he would have won the award in either year, had he been allowed to compete.  And despite the Dean's "considerable" and final discretion under the publication-award

23

program (Doc. 8-2 at 40), Gerber believes he was entitled to a greater share of publication award funds because his survey of other faculty members indicated they received 50% of their "requested publication monies" while Gerber received only 33% of his request (Doc. 8-3 at 51).  Gerber received a pay raise for the 2014–15 academic year.  And while his salary remained the same in the 2012–13 and 2013–14 academic years, that was true for academic years that preceded the October 2012 incident (*see* Docs. 8-1 at 1–9).

Because Gerber does not plausibly allege an adverse employment action materially affecting the terms and conditions of his employment, his O.R.C. § 4113.53 claim fails.

***Common law retaliation***.  Only at-will employees can bring a common-law retaliation claim. *See, e.g.*, *Kusens v. Pascal Co.*, 448 F.3d 349, 366 (6th Cir. 2006) (applying Ohio law).  Gerber is a tenured professor of law with extensive contractual protections against termination or discipline, including a just-cause requirement.  He also can grieve ONU's decisions.  Given these protections, he has no claim under *Greeley v. Miami Valley Maint. Contractors, Inc.*, 49 Ohio St. 3d 228 (1990), and related cases.

### Derivative Liability

Gerber brings two derivative-liability claims against ONU, both of which fail.

First, Gerber does not plausibly allege that ONU is liable for Veltri's assault and battery on the basis of respondeat superior.  "[A]n intentional and wilful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from his employment and his principal or employer is not responsible therefor" except in cases when the violence is intended to serve the employer's purposes. *Byrd v. Faber*, 57 Ohio St. 3d 56, 59 (1991)

(internal quotation marks omitted).  Gerber does not and cannot plausibly allege that ONU's educational mission is furthered when its Law School Dean assaults or threatens a co-worker.

Second, Gerber's IIED claim against ONU, also brought on the basis of respondeat superior, fails because Gerber does not plausibly allege an IIED claim against any of the individual Defendants.

### Leave to Amend the Complaint is Denied

Gerber ends his response to the Motions to Dismiss with a pro forma request for leave to again amend the Complaint in the event this Court concludes any of the claims are not pled adequately. Defendants ask for dismissal with prejudice.

Under Federal Civil Rule 15(a)(2) this Court "should freely give leave [to amend a pleading] when justice so requires."  This Court denies Gerber's request for two reasons.

First, a court can determine whether justice requires amendment only if "the court . . . ha[s] before it the substance of the proposed amendment."  *Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895, 906 (6th Cir. 2002).  "[A] bare request in an opposition to a motion to dismiss -- without any indication of the particular grounds on which amendment is sought -- does not constitute a motion within the contemplation of Rule 15(a)."  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699 (6th Cir. 2004), *abrogated on other grounds as recognized in C & L Ward Bros., Co. v. Outsource Solutions, Inc.*, 547 F. App'x 741, 745 (6th Cir. 2013) (internal quotation marks omitted).

Second, Gerber has pled his case four times: three times in the Hardin County Court of Common Pleas, and once in this Court in March 2015.  By Gerber's own admission, all such complaints have been "substantially similar" (Doc. 8 at ¶ 9).  His original state-court complaint contained five counts against only ONU and Veltri.  ONU moved to dismiss.  Gerber responded in a pro se amended complaint by adding: (1) ten more counts (including conspiracy and defamation

25

claims); and (2) three new Defendants -- Crago, Bales, and Paul (Doc. 15 at 2–3).  Following voluntary dismissal, he refiled in state court in November 2014, shedding only a few claims but none of the five Defendants.  His March 2015 Verified Amended Complaint changed little from the pleading originally removed to this Court in December 2014.

This Court may in its discretion deny leave to amend where a plaintiff "repeated[ly] fail[ed] to cure deficiencies by amendments previously allowed."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Gerber had more than enough chances to craft plausible allegations.  He has not shown he deserves a fifth bite at the apple.

**Gerber's Motions to Strike are Denied**

This Court denies Gerber's Motion to strike portions of Defendants' pleadings for exceeding this Court's briefing page limits or for setting in single-spaced "block" form text that is not a quotation (*see* Doc. 20 at 21–22).  ONU's Motion and Brief in Support is not overlong, because the Motion itself does not count against ONU's twenty-five-page allotment.  Gerber's "block" quote objections have merit but, in its discretion, this Court declines to strike those portions of Defendants' briefs.  However, all parties are on notice that this Court will strictly enforce future briefing orders and relevant provisions of the Local Rules (both ONU and Gerber omitted from their briefs tables of contents or authorities, a requirement under Local Rule 7.1(f) for briefs longer than 15 pages).

### CONCLUSION

Not every workplace dispute gives rise to a federal case.  Certain of Gerber's claims deserve further consideration; others do not.  Therefore, for the reasons noted above, this Court denies ONU's Motion to Dismiss (Doc. 13) as to Counts V (NRS, based on the Veltri incident) and VI (ERISA violation), and denies Veltri's Motion to Dismiss (Doc. 17) as to Counts II (assault) and III (battery).

This Court grants all other Motions to Dismiss  (Docs. 14–16).  Counts V and VI remain against ONU.  Counts II and III remain against Veltri.  All other counts and Defendants Crago, Bales, and Paul are dismissed.  Gerber's Motions to strike are denied (*see* Doc. 20 at 21–22).

     IT IS SO ORDERED.

                            _____*s/ Jack Zouhary*_____
                            JACK ZOUHARY
                            U.S. DISTRICT JUDGE

                            April 30, 2015