IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Scott D. Gerber,                                    Case No. 3:14 CV 2763

                        Plaintiff,                 MEMORANDUM OPINION
                                                   AND ORDER
            -vs-
                                                   JUDGE JACK ZOUHARY
Stephen C. Veltri,

                        Defendant.

## INTRODUCTION

This is a case seemingly ripped from the pages of a first-year torts exam, with the added twist

that the parties are, in real life, law school professors: Plaintiff *pro se* Scott Gerber, a law professor

at Ohio Northern University School of Law ("ONU"), accuses his colleague, Defendant Stephen

Veltri, of an assault and battery in a law school hallway.  The charge:  grabbing Gerber's shoulder in

a "strong and tight fashion."  Veltri admits he "touched" Gerber's shoulder, but merely to direct him

to the nearby faculty lounge so the two could speak privately about Gerber's recent confrontation with

the law school librarian.  After a five-day bench trial and post-trial statements (Docs. 145–146), this

Court finds Gerber's story simply doesn't add up.

## BACKGROUND

First, a disclaimer.  This Court allowed Gerber substantial leeway in the presentation of

evidence out of respect for his *pro se* status.  As a result, this Court heard considerable testimony and

received myriad exhibits that bore little (if any) relation to whether an assault and battery occurred

on October 8, 2012.  These topics include -- but are not limited to -- the awarding of an annual

honorary chair by a faculty committee, ONU's grievance process, reviews of ONU by the American

Bar Association and the Occupational Health and Safety Administration, allegations of faculty

members, other than Veltri, bullying Gerber, and ONU's internal investigation of the alleged assault

and battery in the weeks following October 8.  A retelling of this exhaustive evidence would be

unproductive and carry this Court far afield from the main plot.  The facts below represent those this

Court finds relevant.

Second, a little history.  Gerber began working at ONU in 2001 (Doc. 161 at 70–71).  No one

disputes Gerber is a prolific publisher who has encouraged others on the faculty to write more (Doc.

159 at 45–46).  Veltri has worked at ONU since 1986.  In 2012, he served as interim dean of the law

school (Doc. 132 at 10).  Gerber and Veltri had occasional flare-ups over their decade and a half

working together.  Veltri raised his voice to Gerber during a 2007 faculty meeting, and then

apologized (*id.* at 12–13).  Veltri also, in his role as associate dean of academic affairs, asked Gerber

to teach Remedies.  Gerber initially refused and filed a grievance against Veltri that was dismissed

(*id.* at 18–24).  In short, the parties agree that, in Veltri's words, "over the years [his and Gerber's]

relationship has soured" (*id.* at 27).  It is equally clear Gerber's relationship with much of the ONU

law faculty has worsened during his tenure (*see, e.g.*, *id.* at 77; Doc. 133 at 2–3, 37; Doc. 160 at

66–67, 87).

And now, the rest of the story.  *See* Federal Civil Rule 52(a).

### FINDINGS OF FACT

Gerber learned in early September 2012 that one of his research assistants, David McGoron,

intended to begin working for law librarian Nancy Armstrong after tying up loose ends on the work

McGoron was doing for Gerber (Doc. 160 at 51–52; Tr. Ex. 13).  Gerber took issue with this, writing

2

to Armstrong that "[a]s apparently the only member of the law faculty doing much research, it makes little sense to make it more difficult for me to do it" (Tr. Ex. 60 at 1). By way of a solution, Armstrong offered to pay for McGoron's services from her funding allotment while he finished his work for Gerber (Doc. 160 at 52–53; Tr. Ex. 60 at 2). This apparent cease-fire fell apart on October 8, 2012.

That morning, around 11:00 a.m., Gerber headed to Armstrong's office to ask her about McGoron, whom Gerber hadn't heard from in some time. Andrea Alexander, a reference librarian whose desk was near Armstrong's office, observed that Gerber "appeared agitated" as he entered Armstrong's office (Doc. 133 at 7). Armstrong describes Gerber as "very agitated, and he quickly became very angry" as the two discussed McGoron's status, with Gerber claiming he never agreed to a sharing arrangement (Doc. 161 at 51–53). Gerber yelled, according to both Armstrong and Alexander (*id.* at 53; Doc. 133 at 9–10). Armstrong attempted to reach Associate Dean Bryan Ward, but Gerber pressed the phone receiver to block her call (Doc. 161 at 55). Gerber left, and a short time later Ward met with both Gerber and Armstrong in his office, advising he would look into the situation (Doc. 159 at 106; Doc. 160 at 55–57; Doc. 161 at 64–65). Gerber returned to his office for a time before heading to the faculty lounge to have lunch (Doc. 160 at 58–59).

Shortly after Gerber and Armstrong left Ward's office, Veltri stopped by to ask Ward why his office door had been closed (Doc. 159 at 107). Ward related details of the spat between Gerber and Armstrong (Doc. 132 at 35). Veltri was "irritated" by the news, and stopped by Armstrong's office to hear her side of the story (*id.* at 28, 38). As she was not in her office, he spoke to Alexander before returning to his office (*id.* at 38). A short time later, Veltri had a chance encounter with Gerber in the hallway near the faculty lounge (*id.* at 39–40; Doc. 160 at 60, 73).

As Veltri's "intention [was] to talk with [Gerber] in the faculty lounge about what happened," Veltri placed his left hand -- his non-dominant hand -- on Gerber's right shoulder and suggested "Scott, we need to talk," while directing Gerber toward the faculty lounge with his right hand (Doc. 132 at 44; Doc. 161 at 85).  Gerber describes Veltri as "grab[bing] [his] shoulder in a strong and tight fashion" (Doc. 160 at 59).  Gerber then loudly told Veltri to remove his hand (Doc. 132 at 45; Doc. 160 at 73).

Gerber suggests Veltri was "berating" him during this time, but his testimony on this point was inconsistent.  Gerber recalls little Veltri spoke to him beyond something about harassing staff members (Doc. 160 at 59, 61–62).  He also recounts telling Veltri to "take [his] hands off me, and [Veltri] did.  Then he turns and starts walking to the Dean's suite" (*id.* at 62).  Gerber even disputes that Veltri greeted him with "hello," explaining "[i]t happened quick" (*id.* at 73).  These later descriptions actually comport with Veltri's recollection:  that he briefly suggested "we need to talk" by placing his hand on Gerber's shoulder only for "[a]s long as it is to put your hand on someone's shoulder and then saying don't touch me" (Doc. 132 at 47).

Veltri describes Gerber as seeming "strangely offended" by the contact (*id.* at 45). Veltri explains that while Gerber did not expressly consent to being touched, he did not think it inappropriate to touch Gerber's shoulder because "it's implicit when people talk and they put their hand on your shoulder, direct you to a seat, that there's consent" (*id.* at 58–59).  Veltri did not intend to harm, offend, or place fear in Gerber (Doc. 161 at 86–87).

Gerber's unexpected reaction made Veltri reconsider his plan to speak with him alone in the faculty lounge.  Instead, Veltri asked Ward to join them in Veltri's office to have a discussion (Doc. 132 at 47–48).  Veltri attempted to talk to Gerber about his exchange with Armstrong, but had

4

difficulty getting him to "focus on that" (*id.* at 48–49).  Though Gerber claims Veltri "continue[d] to

berate" him in the office, Ward denies that Veltri yelled at any point during the meeting (Doc. 160

at 62;  Doc. 159 at 110).  Gerber protested that Veltri wasn't "allowed to grab [him]," and Veltri,

according to Gerber, responded "I didn't grab you, I just touched your shoulder" (Doc. 160 at 63).

The meeting concluded with Veltri offering to look into the research assistant situation (*id.* at 64).

Gerber and Ward continued to talk in Ward's office, where Gerber demonstrated how Veltri

had "hit" him (Doc. 159 at 111). At trial, Ward reenacted what Gerber showed him, describing it as

"an openhanded hit, I guess, to the shoulder that was certainly not just a tap but it was not something

that was painful" (*id.* at 112).  Though Gerber disputes Ward's trial demonstration, claiming it to be

more "a grab and a squeeze" (Doc. 160 at 67), Gerber's cross-examination of Ward on this point

focused on asking if Ward would "like it if [Ward's] boss did that" to him (Doc. 159 at 119).

According to Ward, Gerber did not at any point appear to be in physical pain, though he was visibly

upset (Doc. 159 at 112–13, 117).

Gerber then reported the incident to ONU campus security officer Eleanor Laubis (Doc. 133

at 15–16; Doc. 160 at 69–70).  He gave Laubis a statement and demonstrated for her a "tight . . .

powerful squeezing" on a door knob (Doc. 133 at 19–20).  Laubis examined Gerber's shoulder and

found no signs of swelling, bruising, or trauma (*id.* at 31).  Laubis suggested Gerber call the campus

hotline or the local police, as campus security does not make charging decisions (*id.* at 22–24).  He

did call, but the county prosecutor declined to pursue criminal charges (Doc. 159 at 155).

Gerber did not seek medical treatment for his shoulder until October 18, 2013 -- over a year

after his run-in with Veltri and ten days after filing an initial suit in state court (Doc. 160 at 80,

103–04).  Gerber explained the circumstances to his treating physician, Dr. Michael Muha, who

5

diagnosed Gerber with a degenerative, partially torn rotator cuff (Doc. 55 at 11).  Gerber related to

Dr. Muha that he experienced regular shoulder pain dating back to his time as a law student (Doc. 160

at 79–81).  Gerber was also an active weightlifter, working out four to six times a week and regularly

bench-pressing amounts equal to or exceeding his body weight (*id.* at 119–20).

Dr. Muha concluded -- and Gerber does not dispute -- that Veltri's contact did not cause

Gerber's degenerative rotator cuff tear (Doc. 55 at 24; Doc. 160 at 103).  Dr. Robert Anderson, an

orthopedic surgeon and Rule 35 expert who examines around twenty shoulder injuries per week,

concurred that the contact as described and demonstrated to him could not have caused the tear (Doc.

161 at 16–17, 23; Tr. Ex. 121).  Still, Dr. Muha testified it was "very plausible and reasonable" that

Veltri's touch caused pain by exacerbating the tear, also freely admitting this conclusion was based

solely on Gerber's description, without even a demonstration of the alleged grab:

> [W]e didn't really get into the details of the shoulder -- [Gerber] never used the -- or
> the whatever happened to his shoulder, the grab.  We -- basically I never got into the
> details of exactly how that happened other than he related that is what brought and
> provoked the symptoms, and so that's -- to me there's no reason to suspect that there's
> any other reason to do that. . . . I didn't really have any reason to look further than that
> (Doc. 55 at 16, 20).

Dr. Anderson could not recall a circumstance in his twenty-five years as a surgeon in which a

shoulder grab like the one Gerber demonstrated caused or exacerbated pain and suffering related to

a partially torn rotator cuff, though Dr. Anderson did admit there could be a temporary increase in

pain, which is ultimately subjective (Doc. 161 at 24–25, 48).

Gerber claims he suffered mental anguish in addition to aggravation of his shoulder.  Shortly

after October 8, 2012, Gerber contacted Dr. William O'Brien, a clinical psychologist with whom he

had treated in 2007 (Doc. 159 at 7–8).  Dr. O'Brien had no availability, so he referred Gerber to Dr.

Carissa Wott, who treated Gerber six times between October 26, 2012 and November 27, 2012 (Doc.

133 at 58–59, 64).  As this was Gerber's first visit, Dr. Wott had no basis to compare Gerber's mental state before and after October 8 beyond Gerber's own report (*id.* at 71–72).  Dr. Wott diagnosed Gerber with adjustment disorder, mixed anxiety, and depression; based on Gerber's account, she found some of his symptoms to be "long standing" (*id.* at 72).  She explains that a person suffering from these conditions "would have more difficulties" coping with situations a reasonable person would be able to handle in everyday life (*id.*).  Dr. Wott opines that the October 8 incident aggravated Gerber's anxiety and stress (*id.* at 74).

These mental stressors were nothing new: Dr. O'Brien, who treated Gerber prior to October 2012, worked with Gerber back in 2007 on his feelings of isolation and anxiety, and helped Gerber try to establish coping mechanisms for workplace stressors (Doc. 159 at 15).  Father David Young, who regularly counseled Gerber before and after October 2012, recounts that Gerber's "spirits" deteriorated over time, but cannot to say the date in question reflected a noticeable change in Gerber's demeanor (*id.* at 167, 170).

## CONCLUSIONS OF LAW

Gerber alleges Veltri's shoulder touch amounted to assault and battery under Ohio tort law. Assault and battery are distinct but closely related causes of action.

"[T]he tort of assault is defined as the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact.  The threat or attempt must be coupled with a definitive act by one who has the apparent ability to do the harm or to commit the offensive touching.  An essential element of the tort of assault is that the actor knew with substantial certainty that his or her act would bring about harmful or offensive contact." *Smith v. John Deere Co.*, 83 Ohio App. 3d 398, 406 (1993).

7

"A person is subject to liability for battery when he acts intending to cause a harmful or offensive contact, and when a harmful contact results.  Contact which is offensive to a reasonable sense of personal dignity is offensive contact." *Love v. City of Port Clinton*, 37 Ohio St. 3d 98, 99 (1988) (citing *Restatement (Second) of Torts* §§ 19, 25 (1965)).  "In order that a contact be offensive to a reasonable sense of personal dignity, it must be one which would offend the ordinary person and as such one not unduly sensitive as to his personal dignity.  It must, therefore, be a contact which is unwarranted by the social usages prevalent at the time and place at which it is inflicted." *Restatement (Second) of Torts* § 19.

Intent is an essential element of both torts.  Liability for assault requires that the actor actually intend to place another in apprehension of a harmful or offensive contact.  *See Smith*, 83 Ohio App. 3d at 406; *see also Restatement (Third) of Torts: Intentional Torts to Persons* § 103 cmt. f (Discussion Draft 2014) ("For assault, the actor must intend to cause another to apprehend that a harmful or offensive contact is imminent.  Intent merely to cause another to apprehend that a contact is imminent is not enough.").

Yet the kind of intent required for battery is an open question in Ohio.  "There are two main possibilities that courts have taken seriously.  The first is single intent: the actor must intend to cause a physical contact with the person of the plaintiff.  The second possibility is dual intent: the actor must act with that single intent, but also must intend, by that contact, either to offend the other or to cause the other bodily harm." *Restatement (Third) of Torts* § 101 cmt. f.  Ohio has adopted the *Restatement (Second)*'s definition of intent, but courts have found that definition capable of supporting either approach.  *See id.* ("[M]ost jurisdictions . . . purport to follow the *Restatement (Second) of Torts* definition of the required intent . . . .  Unfortunately, this definition itself is ambiguous.").  Lower

8

appellate courts have split on this issue in the absence of clear guidance from the Ohio Supreme Court. *Compare, e.g.*, *Feeney v. Eshack*, 129 Ohio App. 3d 489, 493 (1998) ("[I]t is not necessary to intend the harmful result; it is sufficient to intend the offensive contact that causes the injury."), *with Tarver v. Calex Corp.*, 125 Ohio App. 3d 468, 483–84 (1998) ("To prove assault and battery under Ohio law, a plaintiff must establish that the defendant unlawfully touched him/her with the intent of inflicting injury or at least creating fear of injury."); *see also Restatement (Third) of Torts* § 101 cmt. f (grouping Ohio among "[j]urisdictions that cannot be categorized as favoring either approach").

Yet, "[i]n most circumstances, the choice between the two rules makes no difference as to the actor's liability." *Restatement (Third) of Torts* § 101 cmt. f.  Such is the case here.  Under a dual-intent theory, Gerber presented no evidence from which this Court could infer Veltri intended to cause Gerber harm.  Gerber devoted considerable time at trial to framing this incident as the culmination of years of bullying by Veltri and others.  But the record does not reflect that Gerber's complaints of feeling personally targeted by Veltri were communicated to Veltri such that Veltri would be substantially certain touching Gerber's shoulder would be harmful or offensive.  Veltri intended only to direct Gerber nearby to talk further.  This Court credits Veltri's account.

Because Veltri admitted he meant to touch Gerber's shoulder, Gerber advances a little further under the single-intent approach.  But not much further, because he has not satisfied the remaining element of battery: namely, that the contact be harmful or offensive.  While Veltri acknowledged Gerber did not expressly consent to the touch, he explained that "I did not touch [Gerber] in a way that most people in ordinary life would feel offensive.  I think it's implicit when people talk and they put their hand on your shoulder, direct you to a seat, that there's consent" (Doc. 132 at 58–59).  The

9

*Restatement (Third)*, which Gerber urges this Court to follow (Doc. 145 at 10), includes an illustration that closely mirrors Veltri's explanation.

Illustration 11 describes the following scenario: "Ellen taps Roberta on the shoulder in a movie theater, asking Roberta to turn off her cell phone. The tap aggravates a preexisting shoulder injury, causing Roberta bodily harm. Ellen is not subject to liability to Roberta for battery." *Restatement (Third)* § 101 cmt. f.  The *Restatement* further explains:

> In this case, Ellen satisfies single intent (because she intends to contact Roberta), but does not satisfy dual intent (because she does not intend to cause harm or offense). Nevertheless, the choice of rule is immaterial, because apparent consent precludes liability: it is reasonable for Ellen to believe that Roberta does not object to the ordinary, minor physical contact of a tap on the shoulder to get her attention.  The doctrine of apparent consent significantly limits an actor's potential liability for battery.  It applies, of course, even in cases where the plaintiff does not actually consent to the contact intended by the actor.

Simply put, even accepting their strained relationship, "it [was] reasonable for [Veltri] to believe that [Gerber did] not object to the ordinary, minor physical contact" of touching Gerber's shoulder to direct his attention to the faculty lounge.  *Id.*

Moreover, the facts here present an even clearer case of no liability, because there is no evidence that the contact was either physically harmful or offensive to a reasonable sense of dignity. While Gerber claims his shoulder hurt following the contact, these complaints of pain are belied by the record.  First, campus security officer Eleanor Laubis saw no physical evidence of any injury when she examined him almost immediately following the incident.  Second, Gerber waited over a year before seeking medical attention (a date which coincided with the filing of the initial state-court lawsuit). Third, Gerber had previously been diagnosed with a degenerative partial tear of his rotator cuff, which corroborates Gerber's reports of chronic shoulder pain dating back to his student days. Gerber makes much ado out of Dr. Muha's conclusion to a reasonable degree of medical certainty that

the contact exacerbated Gerber's torn rotator cuff.  But Dr. Muha admits he formed this opinion based *solely* on the medical history as relayed by Gerber.  Dr. Muha also allows that Gerber's weightlifting could have caused the pain, but he did not consider it because Gerber "didn't relate that that was what it was" (Doc. 55 at 21).  In other words, in the absence of any physical evidence of injury, Dr. Muha relied solely on Gerber's word.  In light of the other record evidence, this Court finds that Gerber's word fails to carry his burden to show Veltri's touch caused physical injury.

Nor was the contact offensive to a reasonable sense of personal dignity.  Gerber points to Dr. Wott's opinion that Gerber was traumatized by the encounter.  While this Court does not doubt the sincerity of Gerber's feelings of isolation and frustration at ONU, Dr. Wott first met Gerber after the incident, and had no benchmark for determining the effect the incident had on Gerber's preexisting psyche. Father Young, who knew Gerber from well before, felt Gerber's spirits deteriorated gradually and did not significantly change around October 2012.

Moreover, Dr. Wott also opines that Gerber had difficulty coping with experiences the way a reasonable person would.  "In order that a contact be offensive to a reasonable sense of personal dignity, it must be one which would offend the ordinary person and as such one not unduly sensitive as to his personal dignity.  It must, therefore, be a contact which is unwarranted by the social usages prevalent at the time and place at which it is inflicted." *Restatement (Second) of Torts* § 19.  This Court finds Veltri's contact, a hand on the shoulder, was *not* unwarranted by social usages.  Such contact is common not only between friends and colleagues, but also between strangers.  This is *not* a case involving an intentional, patently offensive gesture, such as blowing cigar smoke in the face of an anti-smoking advocate.  *See Leichtman v. WLW Jacor Commc'ns*, 92 Ohio App. 3d 232, 235 (1994).  To the extent Gerber suffered psychic harm from the contact, it is because he was "unduly

11

sensitive." *Restatement (Second) of Torts* § 19.  And Gerber fails to show Veltri knew (or had reason to know) Gerber would be unreasonably affected by such contact (*see*, *e.g.,* Doc. 132 at 45) ("[Gerber] seemed strangely offended.").

Though the foregoing discussion focuses principally on Gerber's claim for battery, his assault claim fails for largely the same reasons.  Gerber's claim is *not* that he apprehended the oncoming alleged battery, but that once Veltri made contact with his shoulder, he "thought [Veltri] was going to punch [him]" (Doc. 160 at 71).  But the record is devoid of evidence that Veltri intended for Gerber to apprehend anything of the sort.  *See Restatement (Third)* § 103 cmt. f ("[D]ual intent is the appropriate requirement for assault.").  Veltri denied intending to place Gerber in apprehension of anything, and the record corroborates his account.  He took no "definitive act" from which this Court could infer he intended Gerber to apprehend a harmful or offensive contact.  *Smith*, 83 Ohio App. 3d at 406.  He made no sudden movement toward Gerber.  He did not bring his free right hand toward Gerber; in fact, he gestured away, toward the faculty lounge.  He did not say anything to Gerber suggesting he intended to physically harm Gerber.  And Gerber was already in an agitated state from his earlier confrontation with the law librarian.

Finally, Gerber adduced no evidence that Veltri knew of Gerber's heightened state of apprehension such that he would be offended.  The record reflects no history that would have led Veltri to believe with substantial certainty that placing his hand on Gerber's shoulder (and making no aggressive movements) would place Gerber in fear of imminent harm.  *See Smith*, 83 Ohio App. 3d at 406.

**CONCLUSION**

An observer at trial could be forgiven for assuming this case is about Gerber's decade-long struggle for appreciation from his colleagues and administrators at ONU.  But it is not. The Complaint (Doc. 8 at ¶¶ 24–38), and this trial, concerned simply whether Stephen Veltri assaulted and battered Scott Gerber on October 8, 2012.  This Court finds Gerber did not prove his claim by a preponderance of the evidence.

This class, and this case, is dismissed.

IT IS SO ORDERED.

   s/ *Jack Zouhary*
JACK ZOUHARY
U.S. DISTRICT JUDGE

August 24, 2016
